FILED
U.S. DISTRICT COURT
MIDDLE GEORGIA

2015 OCT 21  PM 3: 5

DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. FRANCES MULLINS GARRISON, and STATE OF GEORGIA ex rel. FRANCES MULLINS GARRISON | § § § § § § | CIVIL ACTION NO. 3:15-cv-102 _____ |
| | § | FILED *IN CAMERA*/ |
| **Plaintiffs,** | § § § | UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b) |
| v. | § § | JURY TRIAL DEMAND |
| ATHENS REGIONAL HEALTH SYSTEM, INC.; and ATHENS REGIONAL MEDICAL CENTER HOSPITAL, INC., | § § § § § § | |
| **Defendants** | § | |

## COMPLAINT FOR FALSE CLAIMS VIOLATIONS
## AND OTHER RELIEF

COMES NOW, the UNITED STATES OF AMERICA and STATE OF GEORGIA, Plaintiffs herein, by and through Plaintiff and *Qui Tam* Relator FRANCES MULLINS GARRISON and file this Complaint for False Claims Violations and Other Relief against Defendants ATHENS REGIONAL HEALTH SYSTEM, INC.; and ATHENS REGIONAL MEDICAL CENTER HOSPITAL,

INC., to recover all damages, penalties and other remedies on behalf of Plaintiffs, and show the following:

## I. OVERVIEW OF DEFENDANTS' UNLAWFUL ACTIONS

1.

This is a suit to recover millions in monies received by Defendant Athens Regional Health System, Inc., and Defendant Athens Regional Medical Center Hospital, Inc., from government insurance programs, including Medicaid and Medicare, in violation of the law. Since about 2012, Defendants have engaged in a conspiracy to violate the False Claims Act, 31 U.S.C. §§ 3721 *et seq.*, the Georgia Medicaid False Claims Act, O.C.G.A. § 49-4-168 *et seq.*, and other Federal and State laws, regulations, and instructions, in order to minimize Defendants' costs in purchasing drugs while at the same time, upon information and belief, falsely and fraudulently claiming inflated costs to government insurance programs, including Medicaid and Medicare.

## II. PARTIES, JURISDICTION, AND VENUE

2.

Defendant Athens Regional Health System, Inc. (hereinafter "ARHS") is a Georgia corporation with its principal office located at 1199 Prince Avenue, Athens, Georgia 30606.

2

3.

Defendant Athens Regional Medical Center Hospital, Inc. (hereinafter "ARMC") is a Georgia corporation with its principal office located at 1199 Prince Avenue, Athens, Georgia 30606.

4.

Plaintiff and Relator Frances Mullins Garrison (hereinafter "Plaintiff-Relator"), is a resident of Bishop, Oconee County, Georgia.

5.

Jurisdiction is proper in this Court pursuant to the FCA, 31 U.S.C. § 3730(b)(1), and 31 U.S.C. § 3732(a) for the reason that Plaintiff-Relator seeks remedies on behalf of Plaintiff United States of America.

6.

Venue is proper in this District pursuant to 31 U.S.C. § 3730(b)(1), 31 U.S.C. § 3732(a), and 28 U.S.C. §1391(b) because Defendants can be found in, and transact business in, this District, and because a substantial part of the events giving rise to the claims occurred in this District.

7.

This Court also possesses supplemental jurisdiction over the claims brought by Plaintiff-Relator on behalf of the State of Georgia pursuant to 28 U.S.C. §1367(a) and 31 U.S.C. §3732(b).

## III. ALLEGATIONS

### A. The Federal False Claims Act and the Georgia Medicaid False Claims Act

8.

The False Claims Act, 31 U.S.C. §§ 3721 *et seq.*, provides, in relevant part, that:

> [A]ny person who—
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property... or
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note;

4

Public Law 104–410[ ]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

9.

The Georgia Medicaid False Claims Act provides, in relevant part, that:

(a) Any person who:
> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
> (3) Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;
> (4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and knowingly delivers, or causes to be delivered, less than all of such property or money… or
> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program,

shall be liable to the State of Georgia for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

O.C.G.A. § 49-4-168.1.

10.

Plaintiff-Relator has made written disclosure of substantially all material evidence which Plaintiff-Relator possesses, pursuant to 31 U.S.C. § 3730.

### B. Medicaid and Medicare

11.

Medicaid, established by Title XIX of the Federal Social Security Act, 42 U.S.C. § 1396 *et seq*, is a joint Federal-State program that provides health care benefits for certain groups, primarily the poor and disabled. Medicaid is overseen by the United States Department of Health and Human Services (DHHS). Medicaid is administered in Georgia by the Georgia Department of Community Health (GDCH).

12.

Medicare, Title XVIII of the Social Security Act, 42 U.S.C.18 §1395 *et seq.*, is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by DHHS. Medicare provides for the payment of prescription drugs, hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of Medicare. Medicare Part B is a voluntary program that provides supplemental benefits to elderly or disabled Medicare participants to cover the costs of, among other things, physician services, laboratory and diagnostic tests, ambulance services, and prescription drugs. *See* 42

U.S.C. §§ 1395c *et seq*. Medicare is administered in a particular jurisdiction by a Medicare Administrative Contractor (MAC). The current MAC for Georgia is Cahaba Government Benefit Administrators (CGBA), LLC.

13.

One component of Medicare is a voluntary prescription drug benefits program constituting Medicare Part D. *See* 42 U.S.C. §§ 1395w–101 *et seq*. Medicare Part D provides prescription drug coverage through voluntary enrollment in plans offered by private insurers. Each plan has its own list of covered drugs called a "formulary." Medicare Part D covers all Food and Drug Administration (FDA) approved drugs except drugs covered under Medicare Parts A and B and certain catagories of excluded drugs.

### i. <u>Pharmacy Claims and Reimbursement</u>

14.

Under Medicaid, pharmacies pay pharmaceutical companies for drugs and then submit claims to the State Medicaid agency for reimbursement. *See* 42 U.S.C. §§ 1396a(a)(23), (32). The Federal government then reimburses the state. *See* 42 U.S.C. § 1396–1.

7

15.

Under Part B of Medicare, claims for covered prescription drugs are submitted to the MAC, which reimburses the provider. The MAC is reimbursed by CMS. Part A of Medicare is hospital reimbursement.

16.

Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan "Sponsors," to administer prescription drug plans. When a pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the Part D Plan Sponsor for the costs that are not paid by the beneficiary. The Part D Plan Sponsor then notifies CMS that a drug has been purchased and dispensed, and CMS reimburses the Part D Plan Sponsor.

ii. **Cost Reports and Reimbursement**

17.

Medicare and Medicaid (hereinafter, collectively, "government insurance programs") providers are reimbursed only for services actually rendered to Medicare and Medicaid patients.

8

18.

Reimbursement to providers for Medicare and Medicaid is essentially a cost-based system.

19.

Medicare employs a Diagnostic Related Group (DRG) payment system. It utilizes DRG reimbursement schedules, which provide for certain amounts of reimbursement based upon patients' diagnoses. These DRG amounts are intended to reflect the average cost an efficiently run provider would be expected to incur in treating the patient. *See* 42 C.F.R. § 412.1(a)(1).

20.

"Providers of service participating in the Medicare program are required to submit information to achieve settlement of costs relating to health care services rendered to Medicare beneficiaries." DHHS, CMS, Medicare Provider Reimbursement Manual, Part 2, Form CMS 2552-10, § 100 (December 2010) (citing 42 U.S.C. § 1395g). Medicare providers must submit cost reports, on Form CMS-2552-10, to Medicare on an annual basis. *See* 42 C.F.R. § 413.20(b). The cost report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data.

21.

DHHS/CMS regulations state that Medicare providers "receiving payment on the basis of reimbursable cost must provide adequate cost data. This must be based on their financial and statistical records which must be capable of verification by qualified auditors." 42 C.F.R. § 413.24(a). Medicare providers are required to submit their cost reports electronically with a statement signed by the provider's administrator or chief financial officer certifying the accuracy of the cost report. *See* 42 C.F.R. § 413.24(f)(4). The certification provides that "MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW." Form CMS-2552-10, Worksheet S.

22.

Medicare relies upon the cost report to determine whether a hospital is entitled to additional reimbursement beyond the interim Medicare payments the hospital receives during the year, or whether the hospital was overpaid and therefore must reimburse Medicare for the overpayments. *See* 42 C.F.R. §§ 405.1803, 413.60, 413.64(f)(1).

23.

In many states, including Georgia, provider hospitals participating in Medicaid file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

### iii. Disproportionate Share Hospitals

24.

Under Medicare, the Secretary of DHHS makes additional payments to hospitals which "serve a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F).

25.

The Federal government distributes Federal disproportionate share hospital (DSH) funds or allotments to each State based on a statutory formula. The States then distribute their portion of the DSH funding among qualifying hospitals.

26.

Each state has its own organization for managing DSH program funds. In Georgia, the DSH program is operated under an umbrella program, the Georgia Indigent Care Trust Fund, managed by GDCH.

11

### iv. **The 340B Program**

27.

The Veterans Health Care Act of 1992, codified at Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical manufacturers to provide a statutorily defined discount on out-patient drugs to qualified entities, thereby allowing those entities, public hospitals, community health centers, and other qualified entities, to purchase pharmaceuticals for their patients at a reduced rate, typically 20% to 50% less than non-covered entities would pay for the same pharmaceuticals. Section 340B of the PSHA requires pharmaceutical manufacturers to ensure that Section 340B participants pay no more than the "ceiling price," a discounted price compared to the average manufacturers' price, for any pharmaceutical product. Pharmaceutical manufacturers are required to participate in the 340B Program as a condition of having drug charges reimbursed by Medicaid. The purpose of the 340B Program is to enable participants to stretch scarce Federal and State resources, reaching more eligible patients.

28.

Section 340B requires the Secretary of DHHS to enter into agreements with manufacturers of covered out-patient drugs under which the amount required to be paid to the manufacturer for covered out-patient drugs does not exceed an amount

equal to the average manufacturer price for the drug under title XIX of the Social

Security Act (42 U.S.C. §§ 1396–1 *et seq.*), reduced by a rebate percentage set forth

in 42 U.S.C. § 256b(a)(2). *See* 42 U.S.C. § 256b(a)(1). Under the agreements with

DHHS, manufacturers are required to offer covered out-patient drugs to "covered

entities" for purchase at or below the applicable ceiling price. *See id.*

29.

Section 340B provides that "[w]ith respect to any covered out-patient drug

that is subject to an agreement under this subsection, a covered entity shall not resell

or otherwise transfer the drug to a person who is not a patient of the entity." 42

U.S.C. § 256b(a)(B).

30.

Rules adopted by the United States Health Resources and Services

Administration (HRSA) provide that:

> An individual is a "patient" of a covered entity (with the exception of
> State-operated or funded AIDS drug purchasing assistance programs)
> only if:
>> 1. the covered entity has established a relationship with the
>> individual, such that the covered entity maintains records of the
>> individual's health care; and
>> 2. the individual receives health care services from a health care
>> professional who is either employed by the covered entity or
>> provides health care under contractual or other arrangements
>> (e.g. referral for consultation) such that responsibility for the care
>> provided remains with the covered entity; and

13

3. the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally qualified health center look-alike status.

An individual will not be considered a ''patient'' of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self administration or administration in the home setting.

HRSA, "Notice Regarding Section 602 of the Veterans Health Care Act of 1992, Patient and Entity Eligibility, Final Notice," Federal Register, Vol. 61, No. 207, pp. 55157-58 (Thursday, October 24, 1996).

31.

Section 340B also prohibits duplicate discounts or rebates. *See* 42 U.S.C. § 256b(a)(5)(A).

32.

DHSs are permitted to participate in the 340B Program if the hospital does not "obtain covered out-patient drugs through a group purchasing organization or other group purchasing arrangement." 42 U.S.C. § 256b(a)(4)(L)(iii). "The GPO prohibition is violated upon use of a GPO to obtain covered out-patient drugs and cannot be fixed or cured by subsequently changing the characterization through accounting or other methods." Department Of Health & Human Services, Health Resources and Services Administration, Healthcare System Bureau, Office of Pharmacy Affairs, 340B Drug Pricing Program Notice, Release No. 2013-1,

14

"Statutory Prohibition on Group Purchasing Organization Participation" (February 7, 2013).

## C. Athens Regional Health System, Athens Regional Medical Center Hospital, Athens Regional Pharmacy, and Athens Regional Home Health

### 33.

ARHS is a provider of healthcare services in northeast Georgia, which consists of Athens Regional Medical Center Hospital, four urgent care centers, and a network of physicians and specialists.

### 34.

ARMC is a locally owned and governed hospital with a staff including more than 2,800 employees.

### 35.

Athens Regional in-patient pharmacy (hereinafter "in-patient pharmacy" is an in house pharmacy located within ARMC. The in-patient pharmacy is primarily to provide medication to inpatients and certain outpatients. Employees were able to fill their medications here until 2012 (until the retail pharmacy opened) at raw cost plus a dispensing fee.

### 36.

Athens Regional Retail Pharmacy (hereinafter "Retail Pharmacy") is an in-house pharmacy located within ARMC. ARHS and ARMC started the Retail

Pharmacy in or around October of 2012. Persons who are not patients of ARHS or ARMC are able to fill prescriptions for drugs at the Retail Pharmacy.

37.

ARHS and ARMC operate "Health Plan Select" (hereinafter "HPS"), a not-for-profit health maintenance organization (HMO) affiliated with ARMC. ARHS and ARMC mandated that all of their employees and HPS members fill the majority of their prescriptions at the Retail Pharmacy.

38.

ARHS and ARMC also operate Athens Regional Home Health (hereinafter "ARHH"), a provider of nurses and therapists who provide care in a patient's home to assist with recovery from illness, injury or surgery. Athens Home Infusion Pharmacy is a pharmacy located within ARHH. ARHS and ARMC mandated that all of their employees and HPS members fill their prescriptions for certain high cost injectable medications at Athens Home Infusion Pharmacy. This was in order to utilize 340B drug pricing.

39.

At all material times herein, ARMC has been a provider for the Medicaid Program and the Medicare Program—Medicaid Program Provider Identification #

16

00000074A, Medicare Program Provider Identification # 110074, and National Provider Identification (NPI) # 1437186111.

40.

The Retail Pharmacy is also a provider for the Medicaid Program and the Medicare Program—Medicaid Program Provider Identification # 003129999A, Medicare Program Provider Identification # 1257520002, and NPI # 1639421704.

41.

Upon information and belief, at the time ARMC and the Retail Pharmacy applied to become providers for Medicaid and Medicare, ARMC and the Retail Pharmacy (as well as ARMC's in-patient pharmacy and Athens Home Infusion's pharmacy) executed agreements certifying that ARMC and the Retail Pharmacy would comply with all Federal and State laws, regulations, and program instructions. *See* GDCH, Division of Medical Assistance, Statement o7778f Participation, DMA-001a (Rev. 01/05); DHHS, CMS, Medicare Enrollment Application, Institutional Providers, CMS-855A, § 15 (07/11); DHHS, CMS, Medicare Enrollment Application, Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Suppliers, CMS-855S, § 15 (01/13).

42.

At all material times herein, ARMC has been a DSH under Medicaid. ARMC

receives millions in payments each year as a DSH. For instance, in fiscal year 2010,

ARMC received DSH payments in the amount of $4,762,520. *See* Georgia Medicaid

SFY 2010 Disproportionate Share Hospital Calculation.

43.

At all material times herein, ARMC has been a covered entity and participant

in the 340B Program, designated by 340B Identification # DSH110074. Athens

Home Infusion pharmacy has also been a covered entity and participant in the 340B

Program, designated by 340B Identification # DSH110074A.

44.

ARMC is a member of the following Group Purchasing Organizations

(GPOs): MedAssets, Novation, and Partners Cooperative.

**D. Defendants' Fraudulent Abuse of the 340B Program**

45.

ARHS and ARMC purchase drugs under both 340B and GPO.

46.

ARHS and ARMC dispense drugs acquired through the 340B Program through the Retail Pharmacy, the in-patient pharmacy, and Athens Home Infusion's pharmacy

47.

ARHS and ARMC utilize a computer system with an accumulator which tracks what medications can be purchased at 340B Program pricing.

48.

ARHS and ARMC seek to take advantage of 340B Program pricing whenever and wherever possible, whether or not the drugs are being dispensed to patients.

49.

ARHS and ARMC dispense covered drugs acquired through the 340B Program through the Retail Pharmacy to persons who are not patients of ARMC, including HPS members. ARHS and ARMC also dispense covered drugs acquired through the 340B Program through ARMC's in-patient pharmacy to persons in ATC (Ambulatory Treatment Center) and similar out-patient settings, and to non-patients and HPS members through Athens Home Infusion Pharmacy. ARHS, ARMC, and HPS keep the increased profits from drugs obtained at 340B Program prices. In 2014, HPS realized a surplus of approximately $9,000,000.

19

50.

Until 2015, ARHS and ARMC utilized no guidelines concerning which persons were patients and were entitled to 340B Program pricing. ARHS and ARMC did not differentiate between which persons are patients or non-patients.

51.

HPS is not included on ARMC's cost report, and therefore HPS is not a "covered entity." If a physician is contracted with HPS this does not necessarily qualify prescriptions written for 340B Program eligibility.

52.

ARHS and ARMC will claim 340B Program pricing for more than one drug dispensed to the same patient.

53.

ARHS and ARMC demand refunds from the drug manufacturers.

54.

Through claiming non patients as patients eligible for 340B Program pricing, ARHS and ARMC increase their costs on their cost reports, and increase the amount of reimbursement from Medicare. These costs should be listed under non-reimbursable cost center so as to pick up the proper allocation of indirect costs of these non-patient sales. This also results in outlier payment fraud.

55.

The In-patient Pharmacy is extremely profitable for ARHS and ARMC. ARHS and ARMC paid Tyson bonuses based upon the profitability of the in-patient Pharmacy.

56.

In or around January of 2013, Tyson informed Plaintiff-Relator that he was gathering information on all of ARMC's inpatient pharmacy's customers with prescriptions for Avastin®, or bevacizumab and Rituxan®, or rituximab, chemotherapy drugs, and claiming that the customers were all eligible patients under the 340B Program. Plaintiff-Relator told Tyson that he should not do this. Tyson informed Plaintiff-Relator that he obtained approximately $550,000 from the drug manufacturers as a result of claiming all patients with prescriptions for Avastin® or Rituxan® as 340B Program patients. Upon information and belief, Georgia Medicaid also requested and received rebates from the drug manufacturers.

**E. Defendants' Other Unlawful or Wrongful Practices**

57.

ARHS and ARMC receive certain drugs free of charge from drug manufacturers, such as NovoSeven®, a drug used in the treatment of bleeding and prevention of bleeding for surgeries and procedures in adults and children with

hemophilia; Remicade®, a drug is used to treat rheumatoid arthritis, psoriatic arthritis, ulcerative colitis and Crohn's disease; and Tikosyn®, a medicine for highly symptomatic atrial fibrillation. However, ARHS and ARMC bill insurers and patients for the drugs, including Medicare and Medicaid. ARHS and ARMC also charge patients a copayment for the drugs. ARHS and ARMC will take the drugs out of their packaging and re-package the drugs to dispense to patients.

58.

ARHS and ARMC stock and dispense primarily generic drugs from the inpatient pharmacy. However, ARHS and ARMC list most drugs in their computer system as brand name drugs.

59.

ARHS' and ARMC's inpatient pharmacy charges insurers and patients for brand name drugs despite the fact that ARHS and ARMC dispense the generic drugs. For instance, ARHS and ARMC charge insurers and patients for Zithromax® while they dispense only generic Azithromycin.

60.

ARHS' and ARMC's inpatient pharmacy charges patients for drugs that are "Integral to Procedure".

22

61.

ARHS and ARMC implement a "non-formulary" policy in which ARHS and ARMC refuse to obtain and dispense certain drugs covered by Medicare to Medicare beneficiaries. AHRS and ARMC will inform patients that they must obtain the drugs outside of ARMC, such as through having a family member obtain the drugs from home or from an independent pharmacy and bring the drugs to the patient. ARHS and ARMC refuse to obtain or dispense these drugs because ARHS and ARMC consider the drugs "too expensive." Examples of the drugs which ARHS and ARMC refuse to obtain or dispense include Daliresp®, a drug used to treat patients with chronic obstructive pulmonary disease (COPD); Lumigan®, used to treat open-angle glaucoma and other causes of high pressure inside the eyes; Rapaflo®, a drug used in the treatment of the signs and symptoms of benign prostatic hyperplasia (BPH); Reyataz®, a prescription Human Immunodeficiency Virus (HIV) medicine; and Viread®, an antiviral medication used to treat HIV or the hepatitis B virus.

62.

Relator is aware of at least one instance, ARMC informed a patient with HIV that the only way for the patient to have his medication administered was to purchase the medication at an independent pharmacy. The patient was a Medicare Part D beneficiary. The patient was instructed that he could bring his medication to ARMC

and have it administered to him. All Medicare prescription drug plans are supposed to cover all HIV antiviral medications.

63.

ARHS' and ARMC's "non-formulary" policy results in increased billing of Medicare as a result of testing having to be performed on patients to find an alternative treatment. The policy furthermore results in Medicare Part D being billed where the drugs would have been reimbursed under Medicare Part A since patients are required to obtain the drugs outside of ARMC or ARHS. The policy also endangers patients by forcing patients to discontinue their medications, potentially resulting in resistance to the medication, in the case of HIV; increased ocular pressure and vision damage, in the case of glaucoma; and withdrawal, in the case of antidepressants.

64.

ARHS and ARMC improperly includes costs for their physicians' off-site offices as costs of ARHS and ARMC on their cost reports.

65.

ARHS and ARMC do not list ARHH on HRSA reports. As a result, ARHS and ARMC receive approximately $1,000,000 in rebates from manufacturers to which they are not entitled.

24

66.

A National Drug Code (NDC) is a unique, three-segment number designated by the United States Food and Drug Administration which serves as a universal product identifier for drugs.

67.

ARHS and ARMC list incorrect NDC codes for drugs on their claims to insurers and patients, including their claims to Medicare and Medicaid. ARHS and ARMC misrepresent to the Medicaid Program and the Medicare Program the cost of the drugs which ARHS and ARMC dispense.

68.

ARHS and ARMC cause Medicaid to pay greater amounts in rebates than what Medicaid is required to pay.

69.

ARHS and ARMC refuse to reimburse patients for their out of pocket costs even after ARHS and ARMC receive reimbursement from Medicare and Medicaid.

70.

ARHS and ARMC improperly store drugs which should not be stored, such as Mannitol.

71.

ARHS and ARMC use smaller doses of drugs than necessary. ARHS and ARMC will charge a dispensing fee for each dose in order to maximize their profit. For instance, if a customer requires 40 milligrams (mg) of a drug, the in-patient Pharmacy will dispense two 20 mg doses of the drug. This would allow ARHS and ARMC to charge two dispensing fees and two markups, as opposed to one.

72.

ARHS and ARMC have not updated their drug price schedule, or chargemaster, since 1997.

73.

ARHS' and ARMC's inpatient pharmacy department did not update its NDCs until early 2014.

74.

ARHS' and ARMC's inpatient pharmacy department marks up the prices of drugs dispensed through the pharmacy. ARHS and ARMC mark up some drugs as much as 22,000%.

75.

ARHS' and ARMC's inpatient pharmacy department is slow to respond to drug recalls.

76.

Most of the physicians who refer patients to ARHH are employees of ARHS and ARMC. ARHS and ARMC pay for services to affiliated physician practices including office space, personnel, billing services, and supplies.

77.

ARMC provides a patient discharge list to the Retail Pharmacy and a representative from the retail pharmacy is sent to each patient on the discharge list to gather any discharge prescriptions to be filled in the Retail Pharmacy. Guidelines state that 340B Program entities are to inform patients of their freedom to fill their prescriptions at any pharmacy. ARMC culls discharge patient prescriptions for its financial benefit.

78.

ARHS and ARMC overcharge each customer by at least $100.

79.

From about 2008 to around May of 2012, ARHS and ARMC obtained compounded medications from the New England Compounding Center (NECC), a compounding pharmacy with its principal office located in Framingham, Massachusetts. Compounding is the preparation of an individual drug to meet the prescriber's exact specifications and to be dispensed directly to the patient for which

27

the prescription is labeled. Compounded drugs are not for resale. Manufacturing is the mass production of drug products that have been approved by the United States Food and Drug Administration. These products are sold to pharmacies under State and Federal law for resale to patients.

80.

NECC was only licensed as a compounding pharmacy, yet ARHS and ARMC used NECC as a manufacturer. ARHS and ARMC did not follow the American Society of Hospital Pharmacy (ASHP) Outsourcing Products Assessment Contractor Assessment Tool. ARHS and ARMC used NECC to save money on compounding.

81.

NECC would send ARHS and ARMC compounded medications labeled for a particular patient or person.

82.

ARHS' and ARMC's inpatient pharmacy retained and stored compounded medications from NECC, or portions thereof, which were unused. ARHS and ARMC would administer or dispense the compounded medications to other patients or persons.

83.

ARHS and ARMC would send patient information to NECC. In or around late 2010 to early 2011, Plaintiff-Relator told Tyson that ARHS and ARMC that ARHS and ARMC were violating the Health Insurance Portability and Accountability Act of 1996 (HIPAA) in sending patient names to NECC.

84.

In or around May of 2012, there was a nationwide outbreak of meningitis, which was traced to vials of methylprednisolone distributed by NECC, which had been contaminated with fungi. 64 persons died as a result of the outbreak.

85.

On or about October 4, 2012, Kimberly Furlow, the Director of Operations for the in-patient Pharmacy, instructed Plaintiff-Relator and other employees to not disclose that ARHS and ARMC had ever ordered medications from NECC.

F. **Plaintiff-Relator and Plaintiff-Relator's Interactions With Defendants**

86.

From around 1980 to around 1991, Plaintiff-Relator was the Director of Pharmacy for Morgan Memorial Hospital, located in Madison, Georgia.

87.

From around 1991 to around 2004, Plaintiff-Relator owned and operated Smith Pharmacy, located at 1199 Prince Avenue, Athens, Georgia 30606, across the street from ARMC. In or around 2004, Plaintiff-Relator sold Smith Pharmacy to Eckerd Corporation.

88.

In or around September, 2007, Plaintiff-Relator went to work for ARHS and ARMC part time as a Pharmacist.

89.

Donald Tyson was the Director of Pharmacy Services for ARMC. Kimberly Furlow was the Director of Operations for the in-patient Pharmacy.

90.

On or about August 14, 2012, Tyson held a staff meeting concerning the Retail Pharmacy regarding how to take advantage of 340B Program pricing. Plaintiff-Relator was present during the meeting. Tyson told the staff that the Retail Pharmacy could use 340B Program pricing for all patients. Plaintiff-Relator told Tyson that the Retail Pharmacy could only use 340B Program pricing for patients. Tyson told Plaintiff-Relator that the Retail Pharmacy was using Maxor National Pharmacy Services, L.L.C. (hereinafter "Maxor"), is a Texas limited liability company

providing pharmacy and healthcare services, and that Maxor was an expert in the 340B Program.

91.

In or around August of 2012, Plaintiff-Relator contacted Apexus Answers, an information resource provided by Apexus to promote 340B Program integrity. Plaintiff-Relator communicated with a representative of Apexus Answers named Kimberly Rust. Rust then contacted Plaintiff-Relator and told Plaintiff-Relator that she needed to contact the United States Department of Health and Human Services' (DHHS) Office of Internal Investigations (OIG).

92.

In or around 2013, as ARHS and ARMC were opening the Retail Pharmacy, Plaintiff-Relator met with Tyson and informed Tyson of Plaintiff-Relator's concerns regarding the relationship between the Retail Pharmacy and the 340B Program. Plaintiff-Relator told Tyson that ARMC and the Retail Pharmacy could not use the 340B Program to benefit non-patients or HPS members. Tyson told Plaintiff-Relator, in effect, that Maxor understood the 340B Program.

31

93.

In or around 2013, Plaintiff-Relator also met with Furlow and informed Furlow of Plaintiff-Relator's concerns regarding the relationship between the Retail Pharmacy and the 340B Program.

94.

On or about September 3, 2012, Plaintiff-Relator contacted HRSA's Pharmacy Services Support Center (PSSC). The following day, a representative of PSSC named Susie Bartlemay telephoned the Plaintiff-Relator. Bartlemay referred Plaintiff-Relator to Juanita Delaine with PSSC. Delaine gave Plaintiff-Relator information on how to report ARHS and ARMC to OIG.

95.

On or about September 13, 2012, Bartlemay emailed Plaintiff-Relator and provided Plaintiff-Relator with the definition of a patient under the 340B Program and how to determine if a person is a patient for the purposes of the 340B Program.

96.

On or about September 28, 2012, Plaintiff-Relator reported ARMC online to DHHS OIG.

97.

On or about January 7, 2013, Plaintiff-Relator received a letter from DHHS' Director of the Office of Pharmacy Affairs.

98.

In or around October of 2012, Plaintiff-Relator sent a letter to James Thaw, Chief Executive Officer for ARHS and ARMC, expressing Plaintiff-Relator's concerns about the Retail Pharmacy. Thaw referred Plaintiff-Relator to Brian Ulery.

99.

In or around 2013, Tyson told Plaintiff-Relator, in effect, that he had found a way to use the 340B Program in relation to the inpatient pharmacy department.

100.

In or around 2013, Tyson informed Plaintiff-Relator that he had requested a refund of over $500,000 from manufacturers for chemotherapy drugs administered to various persons. Plaintiff-Relator told Tyson that he should make sure that the persons were patients of ARMC, and not patients of Mark Vrana, M.D., Senior

Physician and Managing Partner of University Cancer & Blood Center, L.L.C., a medical and radiation oncology group.

101.

In or around mid-2013, DHHS conducted an audit of ARMC. DHHS notified ARMC of the results of the audit around the end of 2013. DHHS directed ARMC to repay monies to drug manufacturers. DHHS further ordered Athens Regional Home Infusion Services, a retail pharmacy providing home intravenous therapy and specialty medications, to repay approximately $1,000,000 for providing drugs subject to pricing under the 340B Program to non-patients.

102.

In or around June 3, 2014, Plaintiff-Relator contacted Medicare regarding ARHS' and ARMC's practices.

103.

In or around June 3, 2014, a Medicare representative telephoned Plaintiff-Relator and left Plaintiff-Relator a voice message.

104.

On or about June 19, 2014, Defendants terminated Plaintiff-Relator's employment. Defendants claimed that Plaintiff-Relator was terminated for failure to take a computer training course. Upon information and belief, Plaintiff-Relator

34

believes that she was terminated as a result of her complaints regarding Defendants' practices relating to the Retail Pharmacy and In-patient pharmacy.

## COUNT ONE
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729

105.

Plaintiffs hereby incorporate by reference the allegations in paragraphs 1 through 104 above, as if fully realleged herein.

106.

Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval, or knowingly made, used, or caused to be made or used, false records or statements material to, a false or fraudulent claim, in engaging in the following conduct:

a.  falsely and fraudulently presenting, or causing to be presented, claims for payment for drugs purchased and dispensed under the 340B Program while being prohibited from participation in the 340B Program through Defendants' being members of several GPOs.

b.  falsely and fraudulently presenting, or causing to be presented, claims for payment for drugs purchased and dispensed under the 340B Program to persons who are not patients of ARMC.

35

c.      falsely and fraudulently presenting, or causing to be presented, claims for payment for drugs received at no charge from drug manufacturers;

d.      falsely and fraudulently presenting, or causing to be presented, claims for payment for drugs for which Defendants have inflated the alleged costs;

e.      falsely and fraudulently presenting, or causing to be presented, claims for payment for drugs for the cost of the brand name drug, while Defendants only purchase and dispense the generic drug;

f.      falsely and fraudulently refusing to obtain or dispense to patients certain drugs covered under Medicare;

g.      falsely and fraudulently including costs relating to off-site physicians' offices as costs of Defendants on cost reports;

h.      falsely and fraudulently presenting, or causing to be presented, claims for payment for drugs which list the incorrect NDC codes; and

i.      falsely and fraudulently presenting, or causing to be presented, claims for reimbursement from the Medicaid Program and the Medicare Program in the form of false or fraudulent cost reports, which falsely and fraudulently misrepresented Defendants' actual costs for drugs, thereby falsely and fraudulently increasing the payments or rebates which Defendant's receive

36

pursuant to government insurance programs, including Medicaid and Medicare.

107.

Defendants conspired to commit the violations alleged herein.

108.

Defendants' actions and/or omissions, and/or the false or fraudulent claims, statements and/or records, were material.

109.

But/for Defendants' actions and/or omissions, and/or the false or fraudulent claims, statements and/or records, the government insurance programs would not have paid Defendants' claims, or would have paid the claims in lesser amounts.

110.

As a direct and proximate result of Defendants' actions and/or omissions, and/or the false or fraudulent claims, statements and/or records, Plaintiff United States of America has suffered substantial monetary damages, and has sustained other costs. Pursuant to the False Claims Act, the United States is entitled to treble damages in an amount to be proven at trial, to treble damages, and to a civil penalty of between $5,500.00 and $11,000.00 for each false or fraudulent claim. Plaintiff-Relator is entitled to "qui tam" fees, costs, and reasonable attorney's fees.

## COUNT TWO
## VIOLATIONS OF THE GEORGIA MEDICAID FALSE CLAIMS ACT
## O.C.G.A. § 49-4-168.1

### 111.

Plaintiffs hereby incorporate by reference the allegations in paragraphs 1 through 110 above, as if fully realleged herein.

### 112.

As set forth above, through the actions and omissions alleged herein, Defendants knowingly presented, or caused to be presented, to officers, employees or agents of the State of Georgia false or fraudulent claims for payment or approval, and knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to a false or fraudulent claim, in violation of O.C.G.A. §§ 49-4-168.1.

### 113.

Defendants conspired to commit the violations alleged herein.

### 114.

Defendants' actions and/or omissions, and/or the false or fraudulent claims, statements and/or records, were material.

115.

But/for Defendants' actions and/or omissions, and/or the false or fraudulent claims, statements and/or records, the government insurance programs would not have paid Defendants' claims, or would have paid the claims in lesser amounts.

116.

As a direct and proximate result of Defendants' actions and/or omissions, and/or the false or fraudulent claims, statements and/or records, Plaintiff United States of America has suffered substantial monetary damages, and has sustained other costs. Pursuant to the False Claims Act, the State of Georgia is entitled to treble damages in an amount to be proven at trial, and to treble damages. Plaintiff-Relator is entitled to "qui tam" fees, costs, and reasonable attorney's fees.

## COUNT THREE
## RETALIATION IN VIOLATION OF 31 U.S.C. § 3730
## AND O.C.G.A. § 49-4-168.4

117.

Plaintiffs hereby incorporate by reference the allegations in paragraphs 1 through 116 above, as if fully realleged herein.

118.

After Plaintiff-Relator raised her concerns regarding the Retail Pharmacy and the 340B Program with Defendants, Defendants relieved Plaintiff-Relator of all

responsibilities relating to the Retail Pharmacy. Upon information and belief, in or around June of 2014, Defendants discharged or suspended Plaintiff-Relator from her employment.

119.

Defendants possessed a duty under 31 U.S.C. § 3730(h) of the False Claims Act to refrain from taking retaliatory actions against employees who undertake protected activities in furtherance of the False Claims Act.

120.

Defendants' retaliatory discharge of Plaintiff-Relator was motivated by Plaintiff-Relator's engagement in protected activities of which Defendants had knowledge.

121.

As a direct and proximate result of Defendants' actions, Plaintiff-Relator has suffered substantial monetary damages, and has sustained other costs. Pursuant to the False Claims Act and the Georgia Medicaid False Claims Act, Plaintiff-Relator prays for two (2) times the amount of back pay, plus interest, which she would have received had Defendants not wrongfully terminated her employment in retaliation for protected activities, as well as litigation costs and reasonable attorneys' fees.

40

WHEREFORE, Plaintiff-Relator Frances Mullins Garrison prays for:

1.      Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the United States, plus a civil penalty of up to $11,000 for each violation of 31 U.S.C. § 3729 proven at trial;

2.      Judgment in an amount equal to threefold the damages to be proven at trial against Defendants and in favor of the State of Georgia, plus a civil penalty of $11,000 for each violation of O.C.G.A.. § 49-4-168.1 proven at trial;

3.      Judgment in the maximum amount, plus the maximum percentage, or "qui tam" fees, in favor of Plaintiff-Relator as provided for in the False Claims Act;

4.      Two (2) times the amount of back pay which Plaintiff-Relator would have received had Defendants not wrongfully terminated her employment in retaliation;

5.      The costs and expenses of this action, including interest and reasonable attorney's fees;

6.      Such other, further and different relief, whether preliminary or permanent, legal or equitable, as the Court deems just and proper; and

7.      Trial by jury on all issues so triable.

This 21st day of October, 2015.

James E. Carter
Georgia Bar No. 114400
CARTER CROMWELL LAW GROUP
216 North Main Street
Madison, Georgia 30650
Phone: (706) 438-4225
Email: jcarter@cartercromwell.com

Craig A. Gillen
Georgia Bar No. 294838
Anthony C. Lake
Georgia Bar No. 431149
GILLEN WITHERS & LAKE, LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, Georgia 30305
Phone: (404) 842-9700
Fax: (404) 842-9750
Email: cgillen@gwllawfirm.com

*Counsel for Plaintiff-Relator*
*Frances Mullins Garrison*